AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| United States of America | |
| v. | |
| Andranik Arabyan, | |
| Defendant(s) | |

**FILED**
CLERK, U.S. DISTRICT COURT

3/9/23

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ jm _____ DEPUTY

**LODGED**
CLERK, U.S. DISTRICT COURT

3/9/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: ___ ___ DEPUTY

Case No.    2:23-mj-01095-DUTY

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of March 1, 2023 in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 922(a)(1)(A) | Engaging in the Business of Dealing in Firearms without a License |

This criminal complaint is based on these facts:

 *Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*Complainant's signature*

John Hackman, Task Force Officer, ATF
*Printed name and title*

Sworn to before me and signed in my presence.

Date:            3/9/23

_____
*Judge's Signature*

City and state:   Los Angeles, California

Hon. Michael R. Wilner , U.S. Magistrate Judge
*Printed name and title*

AUSA: Angela C. Makabali (x2331)

**AFFIDAVIT**

I, John E. Hackman, being duly sworn, declare and state as follows:

**I. PURPOSE OF AFFIDAVIT**

1.    This affidavit is made in support of a criminal complaint and arrest warrant for Andranik ARABYAN for a violation of 18 U.S.C. § 922(a)(1)(A) (Engaging in the Business of Dealing in Firearms Without a License).

2.    This affidavit is also made in support of an application for a warrant to search 6832 Simpson Avenue, Apt #C, North Hollywood, CA 91605 (the "SUBJECT PREMISES") as described more fully in Attachment A-1, and the person of ARABYAN, as described more fully in Attachment A-2, for evidence, fruits, instrumentalities, and evidence of violations of Title 18, United States Code, Sections 922(a)(1) (Engaging in the Business of Dealing Firearms Without a License), 922(g)(1) (Felon in Possession of a Firearm and Ammunition), and 922(o) (Illegal Possession of a Machine Gun), and Title 26, United States Code, Section 5861(d) (Possession of an Unregistered Firearm) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A-1, A-2, and B are incorporated herein by reference.

3.    The facts set forth in this affidavit are based on my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest

warrant, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND FOR TASK FORCE OFFICER JOHN E. HACKMAN

4.   I am a Task Force Officer ("TFO") with the United States Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").  I am also an officer for Los Angeles Police Department ("LAPD"), and I have been so employed for approximately 16 years.  I am currently assigned to the LAPD Metropolitan Division Crime Impact Team and am tasked with investigating serial crimes, violent crimes, and crimes involving weapons.  I was previously assigned as a Gang Enforcement Officer at the Southwest and the Devonshire Divisions.  I have received training in have conducted investigations of offenses involving drug trafficking and the illegal possession and use of firearms. Through my training and experience, I am familiar with the ways in which people who are prohibited from possessing firearms acquire, possess, and conceal firearms and ammunition.  I am also familiar with the ways in which drug traffickers and those prohibited from possessing firearms use coded language and digital devices to commit and conceal their crimes.

## III. SUMMARY OF PROBABLE CAUSE

5.   Between January 3, 2023 and March 9, 2023, ARABYAN, a convicted felon currently on supervised release, sold 37 firearms to persons he believed were firearms customers, but

2

were actually working with or for law enforcement. Specifically, on January 3, 2023, sold two firearms to a Confidential Informant ("CI") at the SUBJECT PREMISES. On February 3, 2023 ARABYAN sold three firearms to the UC. On February 14, 2023, ARABYAN sold the UC six firearms with ammunition. On February 17, 2023, ARABYAN sold seven firearms and ammunition to the UC. On February 23, 2023, ARABYAN sold nine firearms to the UC. On March 9, 2023, ARABYAN attempted to sell X firearms. The sales between February 17 and March 9, 2023 occurred in the driveway of the SUBJECT PREMISES.

## IV.   STATEMENT OF PROBABLE CAUSE

6. Based on my training and experience, investigation in this case, personal observations as part of the surveillance team, review of law enforcement reports, review of audio and video recordings, and conversations with other law enforcement agents and a confidential informant[1] working for the ATF (the "CI"), I am aware of the following:

---

[1] The CI has received monetary compensation of $1600.00 for his/her involvement in this investigation. The CI's most recent arrest was in September 2019 for a violation of California Penal Code § 211 (Robbery). The CI was also arrested in July 2015 for a violation of California Penal Code § 32625(A) Possession of a Machine Gun. The CI has a felony conviction for California Penal Code 32625(A) Possession of a Machine Gun.

The CI has been active with ATF since on or about January 2, 2023. The CI came into contact with ATF and myself during a separate robbery investigation where he/she provided information.

To the best of my knowledge, I believe that the information provided by the CI in this investigation has been truthful and reliable.

**A.    January 3, 2023 Firearms Transaction**

7.    During the week of December 26, 2023, the CI contacted me regarding a potential seller of firearms.  The CI told me that the source went by the moniker "Striker" and that s/he had learned about this source (later identified as ARABYAN) from a mutual friend.  The CI provided a vague description of "Striker" and stated that he drove a white Ford truck that was possibly a model F250.

8.    According to the CI, in January 2, 2023, ARABYAN contacted the CI, whom he knew through associates, via FaceTime (a video chat application) and showed him/her a firearm that was available to purchase for $1300.00.  The CI told ARABYAN that he/she would contact him the following day to purchase the firearm and asked if he could obtain anymore firearms.  ARABYAN advised the CI that the firearms transaction would occur at the SUBJECT PREMISES.

9.    On January 3, 2023, at approximately 2:00 PM, the CI met LAPD Officer Enrique Guerrero and me at a predetermined briefing location.  I searched the CI's person and vehicle and found no contraband on him/her or in the vehicle.  Law enforcement provided the CI with an audio/visual recording device to record and $2600.00 to complete the transaction.

10.    LAPD established surveillance units in the area around the SUBJECT PREMISES before the CI left the briefing location.  Upon arriving outside the SUBJECT PREMISES, LAPD Officer Mike Martinez observed a white male with face tattoos leaving the

SUBJECT PREMISES driving a white Ford F250 truck bearing
California license plate number 17864E3.

11.  The CI left the briefing location in his/her vehicle
followed by LAPD Officer Enrique Guerrero and myself.  The CI
parked in front of the SUBJECT PREMISES on the street and
contacted ARABYAN, advising him that he/she was waiting outside
of his residence.  About an hour later, ARABYAN and another
unidentified male returned to the SUBJECT PREMISES.  A
surveillance officer saw that they greeted the CI and then
walked to the back of the apartment complex towards the SUBJECT
PREMISES.

12.  At the back of the apartment complex, ARABYAN walked
up the stairs with the CI following him.  Once upstairs, he went
into his residence and retrieved two firearms.  The CI and
ARABYAN began negotiating the price of firearms.  ARABYAN then
said something to unidentified male, who was still downstairs in
what I believe to be Armenian, and ARABYAN and the unidentified
male agreed on the price of $2300.00 for two firearms.  The CI
paid ARABYAN $2,300.00, which ARABYAN counted out.  The CI left
the SUBJECT PREMISES and returned to his/her vehicle parked on
the street.

13.  The CI then left the location in his/her vehicle and
returned to the debrief location while being followed by Officer
Guerrero and myself.  At the debrief location, I recovered the
firearms from his/her bag and booked these items as evidence.

14.  In law enforcement databases, I queried the license
plate for the white Ford F250, the address of the SUBJECT

PREMISES, and a description of "Striker."  From the search results, I learned that "Striker" appeared to be Adranik ARABYAN, born on 06/28/1990, FBI #69223EH9.  I showed a previous booking photo of ARABYAN to Officer Mike Martinez, who was on surveillance during the controlled transaction, and Officer Martinez confirmed that the person in the photograph was driving the Ford F250 truck before the controlled buy.  I also showed the CI a previous booking photo of ARABYAN, and he/she confirmed the person in the photo was the person that sold him/her the two firearms.

**B.   February 3, 2023 Firearms Transaction**

15.   Based on my review of investigative reports and conversations with other officers I am aware that:

16.   In the days leading up to February 3, 2023, ARABYAN initiated contact with the CI and advised him/her that he had more firearms available to purchase.  ARABYAN and the CI agreed that the controlled transaction would occur on February 3, 2023, and that the CI would contact ARABYAN prior to the transaction.

17.   On February 3, 2023, the CI responded to a staging location, where the CI called ARABYAN while sitting next to the UC.  The CI, UC, and ARABYAN agreed to meet at Erwin Park, 13200 Erwin Street, Van Nuys, CA 91401.  LAPD officers set up surveillance around that park.  I searched the CI for contraband and did not find any.  I gave the UC an audio/visual recording device and funds to complete the transaction.  The UC and CI left the staging location in the same vehicle, and when they

arrived at the park, the CI contacted ARABYAN to see when he was going to arrive.

18.   Less than approximately 30 minutes later, while on surveillance, I saw a grey Toyota Altima bearing California license plate number 8UWL283, travel northbound on Ethel Avenue from Oxnard Street towards the area of the CI and UC.  Based on the photographs of ARABYAN I previously reviewed, the male driving the Altima appeared to be ARABYAN.  I did not see any other occupants in the Altima, which turned east on Erwin Street from Ethel Avenue. The driver, ARABYAN, exited vehicle and made contact with the CI and UC.  The CI introduced the UC to ARABYAN, and they began discussing firearms.  ARABYAN advised that he just had the one firearm on him, that he was attempting to obtain other firearms, and that the other firearms were on their way to the park.  The UC purchased the one firearm, a self-manufactured Glock-style handgun bearing no serial number from ARABYAN for $1,000.  The UC advised ARABYAN that he/she could no longer wait for the additional firearms.  The CI and UC departed the location together in the same vehicle back to the debrief location, and I followed.

19.   While at the debrief location, ARABYAN contacted the CI via Facetime, in the presence of the UC.  ARABYAN advised him/her that the additional firearms were ready to buy, but that ARABYAN needed transportation.  The CI, the UC, and ARABYAN agreed to meet a Denny's restaurant at 11377 Burbank Blvd., North Hollywood.  Surveillance units were deployed to the location.  Upon the CI's return to the debriefing location,

ARABYAN contacted the CI advised him/her that he was close to
the meeting location.  A few minutes later, a silver Mercedes
Benz SUV bearing California license plate number 666BG66 arrived
at the Denny's parking lot.  The UC entered SUV and bought two
more firearms, a self-manufactured Glock style handgun bearing
no serial number and a Glock .45 caliber model 21SF bearing
serial number BBNX701.  The UC and CI left the location together
and returned to the debrief location.

20.  I booked the two firearms recovered as evidence.

**C.   February 14, 2023, Firearms Transaction**

21.  Based on my review of investigative reports, my
participation in this investigation, and conversations with
other officers:

22.  Between February 7, 2023, and February 13, 2023, the
UC spoke with ARABYAN multiple times on the phone, and ARABYAN
advised the UC that he had several firearms for sale.  ARABYAN
and the UC discussed the type of firearms, their prices, and the
location, date, and time of the deal.

23.  The UC arranged for a February 14, 2023, purchase at
approximately 1200 hours at the same Denny's restaurant parking
lot in North Hollywood used for the previous purchase.

24.  On February 14, 2023, several phone calls took place
between the UC and ARABYAN to verify the deal was still taking
place.  That same day, the UC met me at a staging location to
receive an electronic transmitter device and a video recording
device.  The UC told me that the deal was for six firearms for

$8700.00, and I provided the UC with government funds to complete the transaction with ARABYAN.

25.   The UC departed the staging location, and I followed in a different vehicle.  The UC drove to the agreed-upon Denny's, parked in the north parking lot, and contacted ARABYAN to advise that the UC had arrived.  ARABYAN responded that he was on his way driving a blue Sentra.

26.   At approximately 1222 hours ARABYAN arrived in a blue Nissan Sentra bearing California license plate number 8SXY791. A gray Hyundai Genesis sedan bearing California license plate 8ZFK160 driven by an unidentified male  arrived with the blue Sentra.  UC exited the UC's vehicle and exchanged greetings with ARABYAN.  The UC and ARABYAN walked towards the front passenger side door of the blue Sentra.  ARABYAN retrieved a gray Sig Sauer pistol case from the front passenger floorboard, opened the case, and showed a black Sig Sauer semi-automatic pistol to the UC. ARABYAN replaced the pistol to the case and retrieved a brown plastic bag containing other plastic bags.  From one of those plastic bags, ARABYAN retrieved a black polymer semi-automatic pistol, a black Remington semi-automatic pistol, a black Kel-Tec semi-automatic pistol, and a black Bersa semi-automatic pistol from the plastic bag and showed each pistol to the UC.  ARABYAN placed each pistol back in the plastic bag.

27.   The UC walked to the trunk of the UC vehicle and retrieved a black duffle bag.  The UC returned ARABYAN, who was still standing next to the front passenger seat.  The UC opened the duffle bag and ARABYAN proceeded to load the five pistols he

had shown the UC into the duffle bag.  The UC asked ARABYAN about a Kel-Tec rifle ARABYAN had previously said he was going to bring for sale, and ARABYAN replied ARABYAN would have to go pick it up. UC secured the black duffle bag containing the firearms in the trunk of the vehicle.  As the UC was placing the guns in the trunk of the vehicle, ARABYAN asked the UC if the UC could wipe down the firearms and remove ARABYAN's fingerprints.

28.  The UC entered the driver's side of the UC vehicle and ARABYAN sat in the front passenger seat of the same vehicle. The UC counted out the agreed-upon $7000.00 in cash and gave it to ARABYAN.  ARABYAN advised the UC that ARABYAN could quickly go pick up the Kel-Tec rifle he had promised from one of his stash houses.  The UC agreed to wait and advised ARABYAN he would have the previously agreed-upon $1700.00 for the Kel-Tec rifle counted out and ready to go when he returned.  ARABYAN went back to the blue Sentra and drove away followed closely by the gray Hyundai Genesis, whose driver did not exit the vehicle during the transaction.

29.  Surveillance officers attempted to follow ARABYAN, but he drove at a high speed such that it would present a public danger to follow him.

30.  At approximately 1242 hours, ARABYAN returned in the blue Nissan Sentra with the unknown male in the black Hyundai Genesis SUV following.  The UC exited the UC vehicle and retrieved the black duffle bag that contained the pistols from the trunk.  The UC walked over to ARABYAN, who was standing next to the opened front passenger door of the Sentra.  ARABYAN

showed the UC a green Kel-Tec carbine and a black 9mm drum magazine.  The UC opened the black duffle bag, and ARABYAN placed the carbine and drum in the duffle bag.  The UC placed the duffle bag in the trunk of the UC vehicle and handed ARABYAN the previously agreed upon $1700.00 for the carbine, which ARABYAN the counted. ARABYAN advised the UC that on the next deal, ARABYAN would be able to provide AR and AK rifles.  Additionally, ARABYAN advised the UC to be careful when talking on the phone and to talk in code.  ARABYAN got into the Sentra and left westbound through the parking lot, with the Hyundai Genesis SUV once again following ARABYAN.

31.  The UC left in the UC vehicle, and I followed.  We returned to the staging area, and I recovered the firearms purchased, which I also booked into evidence.

   **D.   February 17, 2023 Firearm Transaction.**

32.  Between February 14 and 16, 2023, the UC spoke with ARABYAN multiple times telephonically.  During the phone calls, ARABYAN advised the UC that he had several firearms for sale, including the type of firearms, the prices of those firearms, and the location, date, and time of the deal.

33.  The UC advised me of the telephone calls between ARABYAN and the UC, and of the scheduled February 17, 2023, 12:00 p.m. deal at ARABYAN's residence, the SUBJECT PREMISES.

34.  Leading up to the deal, the UC and ARABYAN spoke over the phone several times to confirm the deal was still taking place.

35.   On February 17, 2023, the UC met with me, and I handed the UC an electronic transmitter device and equipped the UC with a camera recording device.  The UC told me that the deal was for 6 firearms for $12,300.00, and I provided the UC with government funds to complete the transaction.

36.   The UC departed the staging location driving a UC vehicle and drove to the SUBJECT PREMISES, and I followed.

37.   At approximately 1235 hours, I saw the UC arrive at the apartment complex containing the SUBJECT PREMISES.  The UC saw ARABYAN standing in front of the complex.  ARABYAN opened the remote-controlled driveway gate and advised UC to pull in. ARABYAN then walked towards the rear parking lot of the complex, out of sight.  ARABYAN reappeared holding a dark colored suitcase.  The UC reversed the UC vehicle into the north driveway of the complex, stopping just behind the automatic gate.  The UC exited and opened the trunk of the UC vehicle. ARABYAN opened the suitcase and began removing AR style rifles. ARABYAN removed a total of three AR rifles and two AR pistols and placed them in the trunk of the UC vehicle.  Two of the firearms had serialized lower receivers while the other 3 did not have serial numbers.  As he was removing the firearms and placing them in the trunk of the UC vehicle, ARABYAN explained to the UC that 2 of the rifles were fully automatic and that 1 would shoot in 3-round burst.  ARABYAN also told the UC he would demonstrate the rifle was fully automatic by firing it, but the UC told ARABYAN that was not necessary.  ARABYAN also retrieved a black and grey polymer semi-automatic pistol, which he showed

to the UC.  The UC put the pistol in the trunk of the UC vehicle along with the ARs.  ARABYAN retrieved and placed a clear zip lock bag containing live ammunition in the trunk of the UC vehicle.  The UC shut the trunk of the UC vehicle containing the 6 firearms and ammunition.

38.  The UC and ARABYAN remained near the trunk of the UC vehicle while the UC counted out the previously agreed upon $12,300.00 for the 6 firearms and handed it to ARABYAN.  ARABYAN advised the UC he could sell UC an Uzi style firearm, and they talked about future deals.  The UC entered the UC vehicle.

39.  An LAPD police helicopter was deployed to assist in surveilling the location during the controlled purchase.  At the conclusion of the controlled purchase, Tactical Flight Officer Daniel Putnam reported seeing ARABYAN walk to the rear of apartment complex, go up a flight of stairs, and then go out of view.

40.  The UC drove back to the staging area and met me. I recovered the firearms purchased and booked them into evidence.

**E.    February 23, 2023 Firearm Transaction**

41.  Between February 18 and 22, 2023, the UC spoke with ARABYAN multiple times telephonically, during which ARABYAN advised that he had several firearms for sale, including the type of firearms, the price of the firearms, and the location, date, and time of the deal.

42.  On February 23, 2023, at approximately 11:30 am, the UC met with me.  Surveillance officers were deployed to the area around the SUBJECT PREMISES.  I equipped the UC with an

audio/visual recording device and provided funds to complete the transaction.  The UC departed the staging location in the UC vehicle, and I followed.

43.  On the way to the SUBJECT PREMISES, the UC contacted ARABYAN and advised that he/she was approximately 5 minutes away.  Upon arriving at the residence, UC contacted ARABYAN and said that he/she was outside.  A member of the surveillance team saw the gate to driveway of the apartment complex began to open, and ARABYAN greeted the UC.  The UC then backed the UC vehicle into the driveway and began discussing the firearms with ARABYAN while ARABYAN loaded them into the trunk of the UC vehicle. ARABYAN and the UC agreed on $15,000.00 for seven handguns bearing serial numbers and one self-manufactured AR-15 style rifle bearing no serial number.

44.  ARABYAN then said he had one more firearm available to purchase.  ARABYAN walked back towards the stairwell to his apartment, then out of the UC's sight.  ARABYAN returned with a Smith and Wesson Bodyguard handgun, which the UC agreed to purchase for $1,000.00.  The UC exchanged funds for all nine firearms (for a total of $16,000.00) with ARABYAN and departed, followed by me.

45.  The UC returned to a debrief location where I recovered the items from the UC's vehicle and booked them into evidence.

**F.    ARABYAN Contacts the UC Again Regarding Future Firearms Sales**

46.    Between March 4 and 6, 2023, ARABYAN contacted the UC, advised the UC that he had more firearms to sell, and asked when they could meet up.  On March 7, 2023, the UC spoke to ARABYAN, who advised that he had 3 rifles and 8 handguns available to purchase on March 9, 2023 and to meet at the SUBJECT PREMISES for the sale.

**G.    ARABYAN's Criminal History**

47.    On January 6, 2023, I reviewed ARABYAN's criminal history using the California Law Enforcement Telecommunications System ("CLETS") and National Crime Information Center ("NCIC") databases.  Based on my review of this information, I learned that ARABYAN has previously been convicted of the following felony crimes, each punishable by a term of imprisonment exceeding one year:

a.    On or about May 8, 2018, ARABYAN was convicted of Unauthorized Use of a PII, in violation of California Penal Code Section, 530.5 in the Superior Court of the State of California, County of Los Angeles, in case number GA102276;

b.    On or about December 21, 2015, ARABYAN was convicted of Possession of a Firearm, in violation of California Penal Code, Section 25850(C)(6), in the Superior Court of the State of California, County of Los Angeles, in case number: BA440639.

c.    On or about March 27, 2020, ARABYAN was convicted of Felon in Possession of Ammunition in violation of 18 U.S.C.

§ 922(g)(1) in the Central District of California, in case number CR 20-270-GW. ARABYAN is currently on federal supervised release for this case.

### H.   Interstate Nexus

48.   On March 6, 2023, Bureau of Alcohol, Tobacco, and Firearms, and Explosives ("ATF") David Lopez, an Interstate Nexus Expert, examined photographs of the firearm ARABYAN sold to the CI on January 3, 2023, a .45 caliber Springfield Armory semiautomatic pistol, model XDS, bearing serial number BY338886.

49.   SA Lopez also examined the firearm purchased February 3, 2023, a Glock .45 caliber pistol bearing serial number BBNX701.

50.   SA Lopez also examined the six firearms purchased February 14, 2023: one 9mm Keltec CNC Industries Rifle, model Sub-2000, bearing serial number FGH013; one 9 mm Sig Sauer pistol, model SP2022 bearing serial 24B193894; one Bersa pistol, model BP9CC, bearing serial number D66695; one Remmington Arms .380 caliber pistol, model RM380, bearing serial number RM024823C; one Keltec .380 caliber CNC Industries pistol, model P3AT, bearing serial number KN187.

51.   SA Lopez then examined three of the firearms purchased February 17, 2023, including one DPMS Inc .556 caliber A15 rifle bearing serial number FH121286.  The other two firearms SA Lopez examined were self-manufactured and bore no serial number, but SA Lopez determined that the barrel was less than 16 inches. This is defined in 18 U.S.C. § 921(a)(8) as a short-barrel rifle.

52.  SA Lopez also examined the seven firearms purchased on February 23, 2023: one 9 mm Sig Sauer pistol, model P365 bearing serial number NRA042517; one 9 mm Ruger, model LC9, bearing serial number 325-649-42; one .38 caliber Taurus special revolver, model 856, bearing serial number ACG077864; one .380 caliber Smith & Wesson, model MP Bodyguard, bearing serial number KHP7504; one 9 mm Glock, model 43X, bearing serial number BZDL782; one .45 caliber Kimber, model Ultra CDPII, bearing serial number KU343042; and one .45 caliber Springfield pistol, model XD, bearing serial number HE111591.

53.  SA Lopez determined that the above-mentioned firearms were manufactured outside the State of California.  Because the firearms were recovered in Los Angeles, California, I believe that the guns traveled in and affected interstate and foreign commerce.

   **I.   ARABYAN Does Not Have a Federal Firearms License**

54.  On March 9, 2023, I spoke with Leslie Anderson of the Federal Firearms Licensing Center, who advised that no record or entry was found with respect to the application for or issuance of a firearms license to ARABYAN at any address within California for the period of January 3, 2023 through March 9, 2023.

   **V.   TRAINING AND EXPERIENCE ON FIREARMS OFFENSES**

55.  From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

a.   Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices.  It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices on their person and in backpacks or purses in their vicinity.

b.   Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.   Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the

unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

56.   Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VI.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES[2]

57.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary

---

[2] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

58.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

59.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device.  To
unlock a device enabled with a fingerprint unlock function, a
user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second.  To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked
for a certain period of time (often 48 hours or less), or after
a certain number of unsuccessful unlock attempts.  Thus, the
opportunity to use a biometric unlock function even on an
enabled device may exist for only a short time.  I do not know
the passcodes of the devices likely to be found in the search.

c.   In my training and experience, the person who is
in possession of a device or has the device among his or her
belongings at the time the device is found is likely a user of
the device.  However, in my training and experience, that person
may not be the only user of the device whose physical
characteristics are among those that will unlock the device via
biometric features, and it is also possible that the person in
whose possession the device is found is not actually a user of

that device at all.  Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device.  Thus, if while executing the warrant, law enforcement personnel encounter a digital device within the scope of the warrant that may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to, with respect to every person who is located at the SUBJECT PREMISES during the execution of the search who is reasonably believed by law enforcement to be a user of a biometric sensor-enabled device that falls within the scope of the warrant: (1) depress the person's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of the face of the person with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

60.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VIII.  <u>CONCLUSION</u>

61.  For all the reasons described above, there is probable cause to believe that Andranik ARABYAN have committed a violation of Title 18, United States Code, Section 922(a)(1)(A) (Engaging in the Business of Dealing in Firearms Without a License).

62.   Furthermore, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses, will be found at the SUBJECT PREMISES and on the person described in Attachments A-1 and A-2.

_____
John E. Hackman,
Task Force Officer
Bureau of Alcohol, Tobacco,
Firearms, and Explosives

Subscribed to and sworn before me
this __9th day of March 2023.

_____
HONORABLE
UNITED STATES MAGISTRATE JUDGE

24